**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1208n.06

**No. 11-1764**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

TERRENCE P. SHAUGHNESSY,

      **Plaintiff-Appellant,**

v.

INTERPUBLIC GRP. OF COS., INC.,

      **Defendant-Appellee.**

                                          /

**FILED**
*Nov 21, 2012*
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

---

**BEFORE:**    **CLAY and SUTTON, Circuit Judges; RICE, District Judge.**[*]

    **CLAY, Circuit Judge.**  In this diversity case, Plaintiff Terrence P. Shaughnessy sued his former employer, Defendant Interpublic Group of Companies, Inc. ("IPG"), under Michigan law for breach of contract and wrongful discharge, alleging that he was terminated after reporting a fellow employee's unlawful conduct. On appeal, Plaintiff challenges orders by the district court that granted Defendant's motion to dismiss and denied Plaintiff leave to file an amended complaint. For the reasons that follow, we **AFFIRM**.

**BACKGROUND**

    The facts, as pleaded by Plaintiff and taken as true for the purposes of this appeal, are as follows:

---

[*]The Honorable Walter Herbert Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

IPG is a global holding company that owns a family of thirty-eight subsidiary advertising and marketing agencies. In July of 2003, IPG hired Plaintiff to work at its subsidiary company, Momentum Worldwide ("Momentum"). At some unspecified date, Plaintiff was transferred to another of IPG's subsidiaries, GM R*Works, a company whose sole client is the automotive manufacturer, General Motors Company ("General Motors"). During Plaintiff's five-year tenure with IPG-affiliates, his position was designated "at-will." Plaintiff was "highly qualified" for his positions and consistently received "outstanding" performance ratings.

On a yearly basis, IPG required its employees to sign a form formally acknowledging their receipt, awareness, and understanding of the company's written "Code of Conduct" (hereafter the "Code of Conduct" or the "Code"). The Code of Conduct consisted of two parts, titled: "Part 1: Confidentiality and Non-Solicitation Agreement," and "Part 2: Code of Conduct." The two parts outlined IPG's policies on matters such as confidentiality and non-solicitation, conflicts of interest, the receipt of gifts, and prohibitions against trading on inside information.

Significant to the present suit, the Code of Conduct included the following relevant clauses:

A closing statement in Part 1 which, after outlining IPG's policies on confidentiality and non-solicitation, stated that, "[n]othing herein shall change the at-will nature of my employment relationship with the Company."

A preamble to Part 2 stated that IPG "take[s] pride in a reputation of high moral and ethical standards" and has a "commitment as a Company and as Individuals" to "act with fairness, honesty and integrity in all of our business dealings." The preamble also provided:

> This Code of Conduct expresses in general terms the standards of conduct that have
> always been and continue to be expected of all Company employees in their day-to-

day activities and in their relationships with those with whom the Company does business . . . The Code of Conduct is not a comprehensive document intended to address every legal or ethical issue that you might face, nor is it a description of all the laws and policies that apply to Company businesses. It should be used as a guide and a resource to alert you to significant legal and ethical issues that frequently arise.

In addition, the Code encouraged employees to "feel free" to bring up sensitive matters and to direct their questions to IPG's Human Resources Director or Corporate Legal Department. The Code of Conduct referenced a company "Alertline" for employees to call in order to report violations of the Code or of any of IPG's other policies and procedures.[1]

In the closing section of Part 2, under a heading titled "Compliance," the Code of Conduct stated that, "[n]o retaliation will be taken against any employee for raising any concern, question or complaint in good faith."

In addition to the Code of Conduct, Plaintiff also appended to his complaint three other documents as exhibits: (1) an electronic "signature" page confirming that Plaintiff signed his 2008 Code of Conduct form and an electronic note (of unspecified origin, but presumably authored by Plaintiff), in which the writer stated that he reported a Code of Conduct violation in 2007 and was disappointed that his complaint was not handled confidentially; (2) an IPG "Risk Management Bulletin," generally describing how to "repor[t] corruption when you see it," and (3) a May 30, 2007 email from IPG's CEO, Michael Roth, urging employees to complete IPG's online "Code of

---

[1] The complaint does not indicate whether the Alertline is anonymous.

Conduct Course," as a "very important," "key component" of IPG's "pledge to be Sarbanes-Oxley compliant by the end of the year."[2]

The complaint alleges that, at some unspecified date, Plaintiff discovered that "at least one management employee" was "engaging in illegal conduct." Plaintiff discovered that the unnamed employee was falsely billing General Motors for personal expenses, stealing General Motors property and selling it online, using General Motors property for personal purposes, and misusing General Motors funds. Plaintiff reported this misconduct to IPG's corporate attorney who in turn directed Plaintiff to notify senior management. Plaintiff, relying on IPG's Code of Conduct and its written confidentiality and anti-retaliation policies therein, reported the misconduct via IPG's Alertline on March 17, 2007 and April 7, 2007.[3]

Shortly after he made the reports, Plaintiff alleges Defendant began retaliating against him by, *inter alia*, "removing important job assignments, assigning important job functions to other staff members, degrading Plaintiff in front of his clients and co-workers, and [overly scrutinizing] his work performance." Plaintiff does not specifically state who in the corporation was involved either in his report of misconduct or in any of the alleged retaliatory actions. Plaintiff contends that the retaliatory conduct continued until he was terminated on November 3, 2008. Defendant informed

---

[2]The Sarbanes-Oxley Act of 2002, codified at 116 Stat. 745, is the federal statute that set new reporting standards for certain publicly traded corporations in response to the major accounting scandals of the early 2000s, including Enron, Tyco, and WorldCom.

[3]The record is somewhat inconsistent about when this whistleblowing took place and what subsidiary Plaintiff worked for at that time. Although Defendant and the district court state that Plaintiff reported the misconduct while he was working at Momentum, the misconduct appears to be related totally to activities at GM R*Works. The parties have not explained this discrepancy.

Plaintiff that he was terminated as part of a reduction in force attributable to General Motors' financial difficulties during the 2008 financial crisis.

Plaintiff filed this diversity suit on May 29, 2010, alleging claims under Michigan law for breach of contract and wrongful discharge in violation of public policy. On April 23, 2010, Defendant moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff filed a response opposing dismissal and a motion for leave to file a first amended complaint, seeking to add some paragraphs to his original causes of action and an additional claim for promissory estoppel.

The district court held oral argument before issuing an order granting Defendant's motion to dismiss and denying Plaintiff leave to file an amended complaint. *Shaughnessy v. Interpublic Grp. of Cos., Inc.*, No. 09-12077, 2010 WL 2630164 (E.D. Mich. June 28, 2010). Plaintiff moved for reconsideration, focusing on the district court's ruling that his promissory estoppel claim was futile, but was unsuccessful.

This timely appeal followed. Original jurisdiction for this diversity action exists pursuant to 28 U.S.C. § 1332. Appellate jurisdiction lies under 28 U.S.C. § 1291.

**DISCUSSION**

I.    **Standard of Review**

Whether the district court properly dismissed the plaintiff's suit pursuant to Rule 12(b)(6) is a question of law which this Court reviews *de novo*. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456 (6th Cir. 2011). In doing so, this Court construes the complaint in the light most favorable to the plaintiff, accepting its allegations as true, and drawing

all reasonable inferences in the plaintiff's favor. *Id.* (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009)). "In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account . . . [D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim." *Gardner v. United States*, 443 F. App'x 70, 73 (6th Cir. 2011) (quoting *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)). This Court may affirm the district court's ruling on any grounds, including those not relied upon by the district court. *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this standard does not require "detailed factual allegations," it is not sufficient to plead a set of facts that would be merely "consistent with" a claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the plaintiff must allege facts that, accepted as true, provide sufficient "factual enhancement" to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Id.* at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To conduct this analysis, [the] court should first identify factual allegations entitled to a presumption of truth . . . [and] [t]hen the court should consider[] the factual allegations in [the] complaint to

determine if they plausibly suggest an entitlement to relief." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679 (internal quotations, alterations omitted)). Although this court must accept all well-pleaded factual allegations in the complaint as true, this Court need not accept as true "legal conclusion[s] couched as factual allegation[s]." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Iqbal*, 556 U.S. at 678.

This Court typically reviews the denial of a motion for leave to amend a complaint for abuse of discretion. *Ziegler v. Aukerman*, 512 F.3d 777, 786 (6th Cir. 2008). However, a district court is not required to grant leave to amend where the amendment would be futile, or in other words, where the amended complaint would not be able to survive a motion to dismiss. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (6th Cir. 2005) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Where a district court draws a legal conclusion that amendment would be futile, that conclusion is reviewed *de novo*." *Id*. (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)).

## II.     Leave to File an Amended Complaint

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court may freely grant leave to amend a pleading when justice so requires, in order to ensure that a case is tried on its merits "rather than [on] the technicalities of the pleadings." *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986). "In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005).

From the outset, it bears noting that the filing of this case (on May 29, 2009) coincided closely with the Supreme Court's ruling in *Ashcroft v. Iqbal* (decided on May 18, 2009). 556 U.S. 662 (2009). We are sensitive to the fact that Plaintiff's counsel may not have had a full opportunity to digest the significance of *Iqbal* at the time the first complaint was filed. Indeed, the complaint clearly makes no attempt to adhere to *Iqbal*'s enhanced pleading standard. At best, it reflects our prior notice-pleading standard, because it contains only "threadbare recitals of the elements of a cause of action" and "naked assertions devoid of further factual enhancement"—precisely the level of pleading that *Iqbal* squarely rejected.[4] *Id*. at 677–78.

Keeping this context in mind, granting Plaintiff leave to amend would have offered him the opportunity to correct his pleading deficiencies so as to conform with *Iqbal.* Unfortunately, Plaintiff's attempt to revise his complaint in his proposed First Amended Complaint remained woefully inadequate. Notably, Plaintiff failed to supplement his original complaint with any additional factual allegations; although he did at least more properly assert the specific elements of his claims (in addition to adding a third claim for promissory estoppel).

Having reviewed Plaintiff's proposed First Amended Complaint, it is clear that even his revised allegations did not go beyond a bare recitation of the causes of actions alleged. This paltry pleading was insufficient under *Iqbal*. Plaintiff failed to specify, *inter alia*, dates or even approximate time frames, the individuals involved in his alleged reports of misconduct, the individuals involved in his termination, the specific retaliatory actions taken against him, or any

_____

[4]At worst, the complaint fails to meet even the notice pleading standard, because Plaintiff arguably failed to even properly allege the elements of his causes of action.

facts—even circumstantial facts—from which this Court could infer that Plaintiff was terminated because he reported the misconduct of a fellow employee. Accordingly, regardless of the legal merits, Plaintiff's motion for leave to amend was futile because even his revised allegations lacked the factual specificity required to nudge his complaint "across the line from the conceivable to the plausible." *Iqbal*, 556 U.S. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To the extent that Plaintiff alleged acts with any specificity whatsoever, his allegations pertained only to IPG's Code of Conduct and the provisions therein that Plaintiff believed supported his claims. However, and as explained further below, Michigan law strongly disfavors wrongful termination actions brought by at-will employees that are premised solely on a workplace manual, code of conduct, employee handbook, or the like. *See infra*. Because Michigan law does not lightly infer a binding legal agreement from such documents, a plaintiff must allege some extrinsic or circumstantial evidence to infer that the employer either intended to bind itself to an enforceable contract or acted in such a manner as to induce its employees' reliance on its binding promises. *See id.* However, because the complaint was utterly devoid of any allegations of fact beyond the citations to the Code of Conduct, Plaintiff provided next to no basis to justify granting leave to amend or, as further explained below, to survive Defendant's motion for dismissal.

## III.  Breach of Contract

Plaintiff's first claim is that Defendant breached their employment agreement when he was terminated for reporting a fellow employee's misconduct. As the district court correctly noted, this claim depends entirely on Plaintiff's assertion that the Code of Conduct constituted a binding legal contract. In support of this argument, Plaintiff primarily cites the Code's provision promising that,

"[n]o retaliation will be taken against any employee for raising any concern, question or complaint in good faith."

To bring an action for breach of contract under Michigan law, a plaintiff must prove that (1) a valid contract exists between the parties; (2) the terms of contract require the performance of certain actions; (3) a party violated the terms of the contract; and (4) the breach caused an injury to the aggrieved party. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999).

Under Michigan law, contracts for permanent employment or for an indefinite period of time are presumptively construed to be at-will agreements. *Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 271 (Mich. 1991). Here, the parties agree that Plaintiff was an at-will employee. Therefore, his at-will employment contract was subject to termination at any time and for any reason. *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W. 2d 710, 711 (Mich. 1982). In order to show that his employment was not freely terminable, Plaintiff must overcome the presumption of at-will employment by showing, *inter alia*, "an express contract for a definite term or a provision forbidding discharge in the absence of just-cause," or proof that there was "a promise implied in fact of employment security, such as employment for a particular period or to terminate only for just-cause." *Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 271 (Mich. 1991). In deciding whether the parties agreed to such legally enforceable terms, we employ "an objective theory of assent, focusing on how a reasonable person in the position of the promisee would have interpreted the promisor's statements or conduct." *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993).

According to Plaintiff, the district court erred by presuming that his at-will status foreclosed his ability to bring a breach of contract claim. He points out that the Michigan courts have recognized that employment contracts can fall somewhere within the spectrum of being purely at-will versus purely for just-cause, because "parties to an employment contract are free to bind themselves to whatever termination provisions they wish." *Thomas v. John Deere Corp.*, 517 N.W.2d 265, 267 (Mich. 1994). Plaintiff contends that, although he remained an at-will employee for most purposes, IPG freely modified its free authority to terminate, at least in part, when it promised that it would not terminate him for reporting other employees' misconduct.

While Plaintiff is correct that a Michigan employer is free to modify the terms of its agreements with its at-will employees, he nevertheless has failed to provide any authority to overcome the legal analysis used by the district court in rejecting his claim. The district court cited *Dolan v. Continental Airlines*, 563 N.W.2d 23, 29 (Mich. 1997), for the principle that Michigan does not authorize a breach of contract claim that is based solely on the dissemination of an employee handbook containing an implied discharge-for-cause policy. *Shaughnessy*, 2010 WL 2630164, at *4. The district court's citation was correct. *Dolan* clearly states that, "[a]bsent allegations in the pleadings that *clearly and unambiguously* indicate the defendant's intent to create a just-cause employment relationship with all its employees, or in particular with this plaintiff, we hold that [the] plaintiff has not, as a matter of law, stated a claim on which relief can be granted." *Dolan*, 563 N.W.2d at 29 (emphasis added); *see also Rood*, 507 N.W.2d at 606 ("[W]here an employer establishes a policy of discharge for cause, it may become part of an employment contract only when the circumstances (e.g., the language in the handbook itself, or an employer's oral statements or

11

conduct) clearly and unambiguously indicate that the parties so intended."). In the instant case, Plaintiff did not allege any extrinsic or circumstantial facts beyond the Code itself from which this Court could infer Defendant's clear and unambiguous intent to create the employment relationship (either with Defendant individually or with IPG's employees generally) that Plaintiff seeks to impose.

Without any factual allegations to support this claim, Plaintiff's complaint rests solely on language of the Code of Conduct. However, in multiple places throughout the Code, as well as specifically within its non-retaliation portion, IPG reminds its employees that nothing in the Code "shall change the at-will nature of [the] employment relationship," and cautions that the Code "expresses in general terms the standards of conduct," but "is not a comprehensive document intended . . . [as] a description of all laws and policies that apply to Company business." The Code notes that it only "should be used as a guide and a resource to alert [the employee] to common legal and ethical issues." Such language cannot be read objectively to evince a clear and unambiguous intent to create a binding just-cause agreement.

The district court properly found that the holding in *Dolan*, as well as the language of IPG's Code of Conduct, prevent Plaintiff from succeeding under a breach of contract theory as a matter of Michigan law.

## IV.     Wrongful Discharge in Violation of Public Policy

Plaintiff's second claim is that he was discharged in violation of Michigan public policy. The district court found that this claim could not survive dismissal because Plaintiff failed to allege any facts from which to infer that Defendant ever asked Plaintiff to either conceal or to violate any law,

and also because Plaintiff failed to identify any cases to support his theory that the laws and regulations he cited in support of this claim conferred on him any right of protection against retaliation. *Shaughnessy*, 2010 WL 2630164, at *4–5.

Although Michigan ordinarily provides that an at-will employee may be terminated at any time and for any reason, the state nevertheless allows an at-will employee to challenge a discharge that is "so contrary to public policy [so] as to be actionable." *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). A claim of discharge in violation of public policy may rest on one of three grounds: (1) that the employee was "discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty"; (2) that the employee was "discharged for the failure or refusal to violate the law in the course of employment"; or (3) that the employee was "discharged for exercising a right conferred by a well-established legislative enactment." *Edelberg v. Leco Corp.*, 599 N.W.2d 785, 786–87 (Mich. Ct. App.1999) (citing *Suchodolski*, 316 N.W.2d at 711–712).

Plaintiff never specified the theory or theories supporting his public policy discharge claim. In his original complaint, Plaintiff only asserted that "Michigan public policy requires employers to abide by federal and state law and prohibits employers from retaliating against employees who report illegal activity by their employer." (Compl. at 5.) In his amended complaint, Plaintiff was somewhat more specific, alleging that certain Securities and Exchange regulations, the New York Stock Exchange Listing manual, and the Sarbanes-Oxley Act "conferred upon [him] the right not to be retaliated against for making a report of illegal or unethical behavior." (Am. Compl. at 6.)

13

On appeal, Plaintiff cites *Vagts v. Perry Drug Stores*, 516 N.W.2d 102, 104 ( Mich. Ct. App. 1994) and *Kimmelman v. Heather Downs Mgmt. Ltd.*, 753 N.W.2d 265, 268 (Mich. Ct. App. 2008), for the argument that the Michigan courts have recognized sources of public policy other than those found in legislative enactments. According to Plaintiff, the district court therefore erred by too narrowly reading what qualifies as a "law" supporting a public policy discharge claim under *Suchodolski.*

Although Plaintiff's citations are accurate, once again his legal analysis is not. Regardless of whether the SEC Regulations, the NYSE manual, or the SOX Act can meet the broader standards suggested by *Vagts* and *Kimmelman*, Plaintiff has never asserted any facts to support the notion that he was discharged either because he "fail[ed] or refus[ed] to violate those laws" or because he attempted to "exercise rights conferred by a well-established legislative enactment" under those laws. *See Suchodolski*, 316 N.W.2d at 711–712. At its foundation, a Michigan employee only has a valid public policy claim "if he was fired because his employer requested that he break the law, but he failed or refused to do so." *Hein v. All Am. Plywood. Co.*, 232 F.3d 482, 486 (6th Cir. 2000). A plaintiff may not simply cite any and all laws he alleges were violated by his employer's misconduct to support a public policy wrongful discharge claim. Rather, the "[Michigan] Supreme Court's enumerated 'public policies' in the context of wrongful termination all entail an employee *exercising* a right guaranteed by law, *executing* a duty required by law, or *refraining* from violating the law." *Kimmelman*, 753 N.W.2d at 268 (emphasis added).

Supported only by vague factual assertions, it is impossible to conclude that Plaintiff took any action protected under the laws he cited. Likewise, he has provided no allegations to indicate

that Defendant either asked him to violate those specific laws or retaliated against him after he refused to violate those laws. In short, Plaintiff has created no nexus between the laws and regulations and his own termination, even at a circumstantial or speculative level. Without that link, his complaint only alleges that he reported misconduct internally within the company. And as the district court correctly noted, "Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior." *Goldfadden v. Wyeth Labs.*, No. 10-1799, 2012 WL 1676664, at \*5 (6th Cir. May 14, 2012) (quoting *Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 330 (6th Cir. 2003)).

Because there is no indication in the complaint that Plaintiff attempted to act in accordance with the public policies he claimed were violated by his wrongful discharge, Plaintiff's public policy discharge claim was properly dismissed.

## V. Promissory Estoppel

Finally, Plaintiff sought to add a third claim for promissory estoppel/legitimate expectations in his motion for leave to file an amended complaint. The district court denied Plaintiff leave to amend for futility; thereby, it essentially concluded that Plaintiff failed to state a claim under Rule 12(b)(6). *See Shaughnessy*, 2010 WL 2630164, at \*6. We agree.

In order to prevail under a promissory estoppel theory under Michigan law, a plaintiff must establish: (1) a promise; (2) that the promisor can show reasonably should have expected to induce action of a definite and substantial character on the part of the promisee; (3) that the promise produced an actual reliance or forbearance; and (4) that the claimed reliance or forbearance occurred

under circumstances requiring an enforcement of the promise in order to avoid an injustice. *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 166 (Mich. Ct. App. 2008).

As the district court noted, Plaintiff's promissory estoppel claim was his strongest basis for surviving dismissal, if only because Michigan does not judge promissory estoppel claims using traditional contract analysis. *See, e.g.*, *Rood*, 507 N.W.2d at 606 (noting that the plaintiff need not prove a meeting of the minds or even specific knowledge of the employer's policies in order to enforce them under a promissory estoppel theory). Instead, the basis of a promissory estoppel claim stems from whether the employer established its policies and procedures in such a manner as to induce its employees' reasonable, objective reliance thereon. *Id*.

As the Michigan courts have reasoned, when an employer anticipates a benefit from announcing a discharge policy, "presumably with a view of obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force," the employer "may not [thereafter] treat its promise as illusory." *Id*. (quoting *Touissant v. Blue Cross & Blue Shield*, 292 N.W.2d 880, 895 (Mich. 1980)). Accordingly, while an employee handbook—like the Code of Conduct at issue in this case—may be insufficient on its face to support a breach of contract claim, such evidence tends to fare better if used to support a claim brought under a theory of promissory estoppel. *See id*.

"The first step in analyzing a legitimate expectations claim . . . is to determine, *what*, if anything the employer has promised." *Rood*, 507 N.W.2d at 606. A promise is "a manifestation of intention to act or [to] refrain from acting in a *specified way*, so made as to justify a promisee in understanding that commitment has been made." *Id*. (citing the Restatement (Second) of Contracts

§ 2(1) (emphasis in original)). "Once it is determined that a promise has been made, the second step is to determine whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment in the employer's employees. In this regard, [] only policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Id.*

As the district court correctly noted, although Plaintiff's promissory estoppel claim may succeed at the first step, it fails at the second step, due to clear limitations placed on the Code by its own terms. *See Shaughnessy*, 2010 WL 2630164, at *6. Although Defendant issued a policy statement indicating that it would not terminate its employees for reporting misconduct, "not all policy statements [] rise to the level of a promise." *Rood*, 507 N.W.2d at 606. Where, as here, an employer "retains the choice" to either follow or to abandon its specified policy, the policy is, in reality, "not a promise at all." *Id.* In other words, where an employer makes known to its employees that "personnel policies are subject to unilateral changes by the employer," the employee cannot legitimately expect "that any particular policy will continue to remain in force." *Touissant*, 292 N.W.2d at 895. Instead, the employee may only legitimately expect that the policies in force at any given time will be applied uniformly to all. *Id.*

Here, the Code of Conduct expressly limits its statements to informal guidance, advises employees that nothing in its policies modifies an employee's at-will status, and—most importantly—impliedly preserves IPG's ability to change its policies at its unilateral discretion. Reading the document as a whole, it is clear that the Code of Conduct was intended as nothing more than a "flexible framework for operational guidance" and not as "a perpetually binding contractual obligation." *Rood*, 507 N.W.2d at 605. Plaintiff could not have legitimately expected the non-

retaliation provision to be binding given these limitations. And although Plaintiff complains that he was treated unfairly after reporting the misconduct, the complaint does not provide any allegations to suggest that IPG treated Plaintiff's situation any differently than it has handled comparable reports of wrongdoing. Moreover, because Plaintiff has not alleged any facts beyond the Code of Conduct's terms itself, this Court has no basis to believe that Defendant otherwise induced Plaintiff's reliance on the Code's professed policies.

The district court correctly dismissed Plaintiff's promissory estoppel claim, because the disclaimers in the Code of Conduct demonstrate that its non-retaliation provision could not have induced a legitimate reliance rising to the level of a legally enforceable promise. Moreover, Plaintiff has alleged no extrinsic facts from which to infer the contrary.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment dismissing the case and denying Plaintiff leave to file an amended complaint.