NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0440n.06

Case No. 19-2411

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>MICHAEL HART,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)</td><td>ON APPEAL FROM THE</td></tr>
<tr><td></td><td>)</td><td>UNITED STATES DISTRICT</td></tr>
<tr><td>v.</td><td>)</td><td>COURT FOR THE EASTERN</td></tr>
<tr><td></td><td>)</td><td>DISTRICT OF MICHIGAN</td></tr>
<tr><td>PUBLICIS TOUCHPOINT SOLUTIONS, INC.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Defendant-Appellee.</td><td>)</td><td>**O P I N I O N**</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**FILED**
Jul 29, 2020
DEBORAH S. HUNT, Clerk

BEFORE: MOORE, CLAY, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Michael Hart sued his previous employer, Publicis Touchpoint Solutions, claiming that it retaliated against him for refusing to violate the law, in violation of Michigan public policy. The district court granted summary judgment to Publicis, and Hart appealed. Because we find that there is no dispute of material fact, and Hart never refused to violate the law, we **AFFIRM**.

**I**

Michael Hart worked as a professional sales representative for Publicis Touchpoint Solutions from December 2012 to September 2016. Publicis had been hired by Pfizer to provide the sales force for two of Pfizer's prescription drugs, Quillichew ER and Quillivant XR. And so, Hart was assigned a territory in Michigan and given a list of doctors' offices to target for marketing

efforts. Every day, he was required to make eight sales calls. Three or four times per week, he hosted lunches for doctors, and frequently the doctors' staff members, to discuss the drugs. And about once a year, he attended dinner programs where speakers educated medical staff in the audience about Quillichew or Quillivant.

### A. Lansing Pediatrics Lunch

In April 2014, Hart hosted a lunch at Lansing Pediatrics. When he called the office beforehand to confirm the lunch, he was directed to the office manager, Sherry Sheehan. Sheehan requested that he bring lunch for 60 people. She mentioned that any extra meals could go to the night staff or cleaning staff and that her daughter had a softball game that night. Hart balked. Only 30 people had attended his last lunch at Lansing Pediatrics in February. He was hesitant to provide so many extra meals. He believed providing them would violate the Physician Payments Sunshine Act (PPSA), and he told Sheehan so. She grew agitated with Hart, telling him not to question her.

According to Hart, he then spoke to his supervisor at Publicis, John Williams. He told Williams that Sheehan had requested 60 boxed lunches—which he believed violated the PPSA— and that things were "going south in a hurry." Hart says he asked Williams if he could cancel, but Williams told him to go through with the lunch anyway.

Hart proceeded with the Lansing Pediatrics lunch, and things continued to go downhill. Hart brought the 60 boxed lunches Sheehan requested, but he and Sheehan still scuffled about other aspects of the lunch, like the sign-in process. Moreover, only 32 people attended, which meant that Hart had brought 28 extra meals. And a few days later, Sheehan called Publicis to request that Hart no longer visit Lansing Pediatrics. She complained that Hart was "overly aggressive and verbally abusive," and that he "inappropriately touched" a female employee at the lunch.

Williams (Hart's supervisor) and Nancy McConville (Publicis's senior human resources officer) called Hart to address the complaint. Hart defended himself, saying that Sheehan's allegations were baseless. He believed Sheehan complained only because he resisted providing the extra lunches that she requested. McConville allegedly said that she accepted what Hart was saying, but that Publicis had to take the allegations seriously. And so Publicis issued Hart a warning and placed him on disciplinary status, which made Hart ineligible for a bonus.

### B. Dinner Program

Over a year later, in November 2015, Hart attended a dinner program at which Dr. Terry Dickson presented information about Quillivant. In Dr. Dickson's presentation, he made 15 separate mistakes, ranging from benign errors like neglecting to "explain Quillivant XR's proprietary mechanism of release" and misstating which company had developed the medicine, to more concerning errors such as stating that he didn't "think Quillivant XR is abusable" (this despite the "black box warning" that Quillivant has a "high potential for abuse"). Each time he made a mistake, Hart or his co-worker, Susan Tisch, interrupted the doctor to announce a correction. Hart believed every correction to be legally required under the Food, Drug, and Cosmetic Act (FDCA). It was very unusual to have so many corrections, and because Hart believed "this [wa]s a training issue[,]" he felt obligated to tell Lance Lamotta, Pfizer's director of training.

The accounts diverge, but here's what Hart says happened. That night, Hart stepped out of Dr. Dickson's presentation and called Williams. Hart told him about the large number of corrections and his plan to inform Lamotta. Williams told him not to reach out to Lamotta. Hart alleges that, despite Williams's instruction, he sent Lamotta an email (and copied Williams on it) saying that he had made a "whole bunch of corrective statements" at the dinner program and that Lamotta could call him for more details. According to Hart, Williams then scheduled a conference

call between himself, Hart, Tisch, and Lamotta, because Williams wanted to hear whatever Hart said to Lamotta. Williams phoned Hart to tell him about the conference call, and Williams also instructed Hart not to tell Lamotta about all 15 corrections because it would put Publicis in a bad light; Hart could tell Lamotta about only a few. Then, just before the conference call was to begin, Hart says that Williams sent him a text message saying, "if you open your mouth and say one word to Pfizer, things are going to get very bad for you."

Williams denies all of this. He says he didn't tell Hart not to inform Lamotta about the corrections. And he never sent a threatening text saying that if Hart talked to Lamotta things would get bad for him.

Here's Hart's recollection of the conference call. At first Williams did most of the talking, trying to cut off the call by saying that that they didn't need to waste Lamotta's time with any specifics. But Lamotta asked to hear from Hart. So, Hart explained that he had made 15 corrections at the dinner program and that Williams had asked him not to tell Lamotta about them. When Hart finished, Lamotta allegedly said he wasn't concerned about the corrections Hart had made, but he was concerned about the lack of corrections reported by Williams in earlier programs. Curiously, Hart says that Williams texted him, "good job," after they hung up. But then when Hart and Williams attended a national sales conference in Las Vegas months later, Williams told him "not to talk to anyone from Pfizer"—"[e]specially Lance Lamotta." According to Hart, this instruction was retaliation for Hart's telling Lamotta about the corrections.

According to Williams, the conference call described by Hart never happened, and such a call wouldn't have happened under Publicis's procedure for handling corrections at speaker programs. He says that Lamotta wouldn't be involved in corrections made in any individual program, only the legal team would be. Williams also denies instructing Hart not to speak to

anyone from Pfizer at the conference in Las Vegas. As for Lamotta, he says he remembers seeing Williams at sales conferences every year but doesn't recall any phone conversations with him.

### C. Meetings with Dr. Field

Almost a year later, in September 2016, Williams asked Hart to get him a meeting with Dr. Field, one of the doctors on Hart's assigned list of contacts. And he asked for a meeting the next day, which happened to be a Friday. Williams wanted a letter from Dr. Field advocating for adding Quillichew to Michigan's list of Medicaid-approved drugs. According to Hart, Williams wanted Dr. Field's signature on a letter pre-written by Pfizer, which Hart alleges would violate the Michigan Medicaid False Claims Act. Hart said he would try to arrange the meeting, but it might be difficult given the short notice.

In the meantime, Williams called on Dr. Field's office himself. He was told that the doctor couldn't meet with him because the office was closed on Fridays. Williams was surprised by this. He double-checked Michael's reports in Publicis's system, and Hart had recorded visiting Dr. Field on several Fridays.

Back to Hart. Hart says that when he called Dr. Field's office to arrange the meeting for Williams, he got a mouthful from Leslie Field, the office receptionist. According to Hart, she complained that Williams had been badgering them all day, insisting that Dr. Field meet with him the next day, and she said the office was "not going to play ball [with] somebody dictating what the doctor is going to do with his time."

Then Williams called Hart. Williams mentioned that he was disappointed that Hart had reported meetings with Dr. Field on Fridays when the office was closed. According to Williams, Hart admitted that he didn't speak with Dr. Field on those Fridays, but he insisted that he had visited the office and reported the calls in order to keep up his call numbers.

### D. Hart's Termination

About a week later, Williams called Hart and terminated his employment at Publicis. He explained that Hart was being fired for reporting Friday meetings with Dr. Field that never happened. Hart objected. Hart says that the office wasn't closed on Fridays. The doctor didn't usually see patients, but the staff was frequently still there. According to Hart, he had performed whole-office visits with Dr. Field's staff on those Fridays, which he says are permissible under Publicis policy and are indistinguishable in the reporting system from meetings with the doctor himself. Hart demanded that Williams tell him what calls he had fabricated. Williams couldn't tell him, and a representative from HR said it didn't matter because the decision had been made to fire Hart.

Upset, Hart then went back to Dr. Field's office. According to him, he asked the receptionist, Leslie Field, to confirm which dates he had visited their office to cross-reference his records. According to Ms. Field, Hart handed her a list of dates and demanded that she lie and say he visited the office on those days, saying he would be fired if she didn't. Hart argues this is implausible since he had already been fired when he visited the office. Ms. Field says Hart refused to leave until she said they would consider saying he visited the office on the given dates. Even then, Ms. Field says, another doctor had to ask him to leave, threatening to call the police. Hart denies refusing to leave.

According to Ms. Field, Publicis did call to check whether the "meetings had taken place and office staff did truthfully relay that no record of such meetings existed, Dr. Field had no recollection of these meetings, and on at least 2 of the dates in question such a meeting would not have been possible."

Hart then sued Publicis, alleging that it retaliated against him for refusing to violate the law. The district court granted summary judgment to Publicis, and Hart appealed. *Hart v. Publicis Touchpoint Sols., Inc.*, No. 18-12899, 2019 WL 5788562 (E.D. Mich. Nov. 6, 2019).

## II

We review the district court's grant of summary judgment de novo. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). Summary judgment is appropriate if Publicis "shows that there is no genuine dispute as to any material fact and [Publicis] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). So, viewing the facts in the light most favorable to Hart, the non-movant, we must determine whether Hart raised a genuine issue as to whether Publicis retaliated against him for refusing to violate the law. *Brumley*, 909 F.3d at 839. Because we find no genuine issue of material fact, we affirm the judgment of the district court.

## III

Under Michigan law, employment is presumed to be at-will. *Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998). An employer can fire an at-will employee for a "good reason, bad reason, or no reason at all." *Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591, 606 (2008) (internal quotation omitted); *accord Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982) (per curiam). There is a narrow exception, however. Michigan law recognizes that "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski,* 316 N.W.2d at 711. Employers violate public policy when they fire employees for their "failure or refusal to violate the law in the course of employment." *Rivera v. SVRC Indus., Inc.*, 934 N.W.2d 286, 298 (Mich. Ct. App. 2019) (quoting *Kimmelman v. Heather Downs Mgmt. Ltd.*, 753 N.W.2d 265, 268 (Mich. Ct. App. 2008)). Hart claims that Publicis did just that; it fired him for refusing or failing to violate the law on three different occasions. The problem for Hart is that none of the

things he says Publicis asked him to do amount to a violation of law, at least not of the provisions he argues on appeal. Thus, even if we accept his account of every disputed fact, Hart never actively refused to break the law.

First, Hart objected to providing 60 boxed lunches at an event that he anticipated only 30 people would attend. Hart says the extra lunches ran afoul of two statutes: the Physician Payments Sunshine Act and the Anti-Kickback Statute.

The Physician Payments Sunshine Act is a reporting statute. It doesn't limit how much money a company like Publicis spends on doctors; it just requires them to honestly report how much they spend. 42 U.S.C. § 1320a-7h; *Hall v. St. Jude Med. S.C., Inc.*, 326 F. Supp. 3d 770, 782–83 (D. Minn. 2018); *Burns v. Medtronic, Inc.*, No. 8:15-CV-2330-T17-TBM, 2016 WL 3769369, at *6 (M.D. Fla. July 12, 2016). Hart doesn't allege that anyone asked him to falsely report his spending, and, more importantly, he doesn't allege that he refused to file a false report. He objected only to holding the event and providing the extra lunches.

The Anti-Kickback Statute (AKS) proscribes "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, [or] order . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). Hart's argument boils down to the contention that 28 extra sandwiches, purportedly given to the night staff, the cleaning staff, and the office manager's daughter's softball team, constituted a kickback intended to induce the doctors at Lansing Pediatrics to prescribe Quillivant more often. But even if providing free food to a physician's staff could, in some case, induce a physician to prescribe more of a prescription drug (at the federal government's expense), Hart presents no evidence that a reasonable person in

his position could have thought that that's what was occurring here. He points to no evidence indicating that Publicis or Pfizer intended the sandwiches to be bribes; that Lansing Pediatrics solicited the sandwiches as bribes; or that, even if the sandwiches could somehow be construed as bribes, their provision here related to either Quillvant prescriptions in general or federal healthcare spending in particular. All of which makes this case even weaker than prior AKS retaliation cases where we have affirmed grants of summary judgment to employers. *Cf., e.g.*, *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 395–96 (6th Cir. 2015) (plaintiff alleged that she was fired after accusing her employer of providing jackets and food to a group of ER doctors in exchange for those doctors requesting Medicare-funded ambulatory services from her employer's client, which the doctors regularly did). So this part of Hart's claim fails.

Next, Hart insisted on telling Lamotta about the corrections he made at the dinner program, despite being told not to by Williams. But, just like holding the lunch, failing to tell Lamotta wouldn't have violated the law. Hart points to the Food, Drug, and Cosmetic Act (FDCA). Specifically, he relies on the section prohibiting misbranding a drug. 21 U.S.C. §§ 331(b), 352. Even if we assume that the corrections themselves were required to prevent misbranding under the FDCA, it doesn't matter. Hart doesn't allege that he was retaliated against for making the corrections; he says he was retaliated against for telling Lamotta about them. And Hart doesn't cite anything in the FDCA that required Hart to notify Lamotta. (Nor, in our own research, can we find any such requirement.) Therefore, Hart wasn't refusing to violate the law when he insisted on reporting the corrections to Lamotta.

Compare this case to *Meury v. Connie Kalitta Services/American International Airways, Inc.*, 181 F.3d 102 (Table), 1999 WL 357774 (6th Cir. 1999), *superseded by statute on other grounds*, Whistleblowers' Protection Act, Mich. Comp. Laws §§ 15.361–15.369. There we found

that the federal aviation regulations required pilots to report violations to their supervisors, and so any pilot who was retaliated against for reporting a violation was retaliated against for refusing to violate the law. *Id.* at *2; *see also Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 329 (6th Cir. 2003) ("[T]he facts in *Meury* indicate that under the federal aviation regulations the plaintiff had an affirmative legal duty to report the violation, and therefore his reporting of the violation essentially amounted to a failure to violate the law . . . ."). Unlike the federal aviation regulations discussed in *Meury*, the FDCA does not appear to require sales associates to report potential violations to their supervisors (and Hart doesn't argue otherwise).

One might think that even if the FDCA did not *require* Hart to tell Lamotta about the misstatements, the purpose of the statute was served by Hart doing so. Under this line of reasoning, one could be forgiven for thinking that Hart might still have a claim for retaliation in violation of Michigan public policy. Not so. As we have recognized on several occasions, "Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior." *Shaughnessy v. Interpublic Grp. of Cos., Inc.*, 506 F. App'x 369, 377 (6th Cir. 2012) (quoting *Goldfaden v. Wyeth Labs.*, 482 F. App'x 44, 50 (6th Cir. 2012), quoting in turn *Cushman-Lagerstrom*, 72 F. App'x at 330). And, again, Hart doesn't argue to the contrary.

Last is the attempted meeting between Williams and Dr. Field. Hart says setting up the meeting would have implicated the Michigan Medicaid False Claim Act because Williams planned to ask Dr. Field to sign a pre-written letter, which Williams intended to submit to the state in support of adding Quillichew to the Medicaid preferred drug list. Admittedly, this looks bad. But Hart still hasn't directed us to any law that this would violate. He cites only a section of the Michigan Medicaid False Claim Act that proscribes "soliciti[ing], offer[ing], or receiv[ing] a

kickback or bribe" in return for medical staff prescribing a certain medication or providing a certain service, for which the medical professional could bill Medicaid. Mich. Comp. Laws § 400.604.

Hart has presented no evidence that Williams planned to offer Dr. Field a bribe or kickback for signing the letter. In his initial complaint, Hart said that Williams planned "to provide a kickback or bribe to Dr. Field by placing him on the list, in exchange for his signature on the letter." But this doesn't make sense. Hart doesn't talk about any lists besides Michigan's Medicaid preferred drug list, and it's unclear how Dr. Field, as a physician, could be placed on a list of approved drugs. Besides this being nonsensical, there is also no evidence to support the claim. Hart attempts to remedy this problem in his brief on appeal by alleging that there was a different bribe: his brief says that Publicis was *already* furnishing Dr. Field with goods and services, which purportedly served as the bribe for Dr. Field's signature. But, apart from this broad statement in Hart's appellate brief, Hart points to no evidence suggesting that Publicis provided *any* goods or services to Dr. Field's office, and certainly no goods or services provided in anything other than an arms-length commercial transaction. And even if this allegation were true, without more, Hart cannot show how asking a customer for a letter like the one at issue in this case could alone demonstrate a kickback or bribe. Because there is no evidence of any planned bribe, arranging the meeting would not have violated the Michigan Medicaid False Claim Act.

Because none of the things Hart claims that Publicis asked him to do violated the statutes he points to in his summary judgment opposition, Hart's retaliation claims fall flat. "[A]n employer cannot engage in forbidden retaliation without an employee's participation in activity protected by law." *Jones-McNamara*, 630 F. App'x at 404. Publicis didn't retaliate against him in violation of public policy when it fired him, and it didn't retaliate against him when Williams

allegedly instructed him not to speak to Lamotta in Las Vegas or when Publicis issued Hart a warning that made him ineligible for a bonus.

**IV**

For these reasons, we affirm the district court's grant of summary judgment to Publicis.